OPINION OF THE COURT
 

 Kaye, J.
 

 The legal question at the core of this human drama is whether an option permitting plaintiff to purchase a nursing home is so indefinite in its price term as to preclude enforcement by the courts. Contrary to the trial court and the Appellate Division, we conclude that the price term is sufficiently definite, and therefore grant judgment to plaintiff requiring specific performance of the contract.
 

 The agreement at issue arose in connection with the nursing home scandals of the 1970’s. Eugene Hollander, then a prominent figure in the industry, had for years been the operator of several nursing homes, until his felony convictions in 1976. He was and remains president of defendant Henry
 
 *479
 
 and Warren Corporation, owner of the Brooklyn property plaintiff seeks to purchase; his wife was and remains the corporation’s sole shareholder. Prior to his convictions Hollander and his wife leased this property from defendant corporation, and operated the Congress Nursing Home there.
 

 In July 1975 Hollander was indicted by State and Federal Grand Juries for crimes involving unwarranted health and medical care reimbursements. Faced with possible loss of operating certificates and preclusion from the nursing home business, Hollander during plea negotiations asked that the Department of Health appoint receivers who would continue to operate his nursing homes and pay rent to Henry and Warren Corporation.
 
 *
 
 Negotiations ensued for the appointment of plaintiff — a not-for-profit hospital corporation organized by community residents — as receiver for the Congress Nursing Home. Hollander’s efforts at similar arrangements for his other nursing homes proved fruitless, as did his litigation to compel appointment of receivers for those facilities.
 

 Talks regarding plaintiff’s receivership continued through year-end. At a meeting in December, the Department informed Hollander that the maximum rent payable by a receiver would be calculated pursuant to the Medicaid reimbursement regulations (10 NYCRR part 86), which provided for reimbursement based upon a facility’s historical cost. Thus calculated, projected rent for Congress was approximately half the amount defendant was then receiving. The Department refused to reconsider the matter, and indeed advised Hollander that it would take steps to revoke his operating certificates if a receiver was not soon installed.
 

 In May 1976 Hollander entered a plea to the Federal charges and was sentenced to a five-year term of imprisonment (which was suspended), fined $10,000 and placed on probation for five years; a condition of his probation was that
 
 *480
 
 he "divest himself of all connections, direct or indirect, with any occupation that requires the custody or care of other people.” Hollander had earlier pleaded guilty in State Supreme Court to the felonies of grand larceny in the second degree and offering a false instrument for filing in the first degree, but sentencing on the State charges was postponed because of the ongoing negotiations involving the transfer to plaintiff.
 

 On May 17, 1976, a receivership agreement was signed by plaintiff, defendant, the Hollanders and the Department. On that same date, plaintiff and defendant additionally entered into a lease for the premises, assuring defendant continuing income from the operation of the nursing home, with rent to be "determined * * * by [the Department of Health] pursuant to all applicable statutes, rules and regulations.” Both the receivership agreement and the lease — each incorporating the other — contain the following purchase option: "During the Term of the Lease, [plaintiff] shall have an option to purchase the premises (including without limitation the improvements thereon and the items set forth on the Inventory) at any time during said Term at a price determined by the Department in accordance with the Public Health Law and all applicable rules and regulations of the Department without prejudice to the remedies, if any, of the parties herein.”
 

 The very day after these agreements were signed — May 18, 1976 — Hollander was sentenced to five years’ probation conditioned on payment of a fine of $250,000 and $1,000,000 restitution to the State, as well as permanent divestiture of all his nursing home interests. The receivership agreement and lease enabled Hollander to represent to the sentencing court that he was completely out of the nursing home business.
 

 More than three years later, in fall 1979, plaintiff notified the Department that it elected to exercise its option, and asked the Department to set the price. The Department in turn supplied "a computation of the Medicaid allowable transfer price which is the Price as called for by the Receiver Agreement.” As the Department explained: "The Medicaid allowable transfer price (as well as Medicaid reimbursement for capital cost) is based upon the original historical cost of a facility as reported to the Department, subject to Departmental review. The original historical cost of a facility is also called the initial allowed facility cost and is defined in 10 NYCRR 86-2.21(a)(6). This cost serves as the basis for a capital
 
 *481
 
 cost component in the Medicaid reimbursement rate determined pursuant to 10 NYCRR 86-2.21(e).” The Department determined that as of January 1, 1980, the initial price defined in the purchase option provisions of the agreements was $3,046,352.
 

 Plaintiff exercised the option, and delivered its down payment. Defendant, however, refused stating that it had "no intention of selling the facility in question to Cobble Hill at a price to be established by the Department in accordance with the Public Health Law as it is presently constituted.” Defendant objected that the transfer price established by those provisions was "confiscatory,” in that it bore "no relation to market value or any other reasonable criteria of true value for this facility.” Defendant filed suit in the United States District Court for the Eastern District of New York, alleging due process violations and unjust taking. Those charges were dismissed for failure to state a claim, and the pendent State law claims were dismissed for want of jurisdiction.
 

 Plaintiff meanwhile commenced an action in the State Supreme Court for specific performance of the option; defendant counterclaimed for rescission or adjustment of rent payments to fair market value. Defendant also separately sued the Department and the Commissioner of Health (intervenor on this appeal) challenging the determinations of rent and price as less than fair value. Both State court actions were consolidated into the present suit.
 

 In response to plaintiff’s motion for summary judgment, the parties entered into a stipulation. By agreement, Supreme Court awarded plaintiff partial summary judgment and struck defendant’s affirmative defenses and the counterclaims except for "financial matters,” which were reserved for the court. If the parties could not themselves reach an amicable resolution by June 16, 1986, they were to return to court for a hearing on those matters. In December 1986, at a hearing on the open financial matters, Supreme Court
 
 sua sponte
 
 vacated the stipulation and proceeded to hear argument on the validity of the option. Defendant at that point contended that the option was void for indefiniteness of the price term, in that no provision of the Public Health Law or the Department’s rules and regulations provide a method for fixing the sales price of real property.
 

 Supreme Court dismissed the complaint, finding that the option agreement was unenforceable for failure to specify a
 
 *482
 
 method by which price could be determined, and a divided Appellate Division affirmed. The court concluded that the specified law and regulations did not provide an explicit mechanism for determining purchase price, and that the parties had therefore failed to state an essential term, rendering the option unenforceable. The dissenting Justice, by contrast, found an enforceable contract, because the option expressed the parties’ intent that the price be fixed by a third party, or because the agreement set forth a practicable method by which price was to be determined, or because the question was foreclosed by the parties’ stipulation for partial summary judgment (144 AD2d 518, 524-527).
 

 After dismissal for nonfinality of a motion for leave to appeal to this court, Supreme Court granted defendant’s application to direct plaintiff to surrender possession of the nursing home — at the time housing more than 500 elderly residents— and denied a cross motion for a stay. We then granted leave to appeal as well as a stay, and now reverse.
 

 Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract
 
 (Martin Delicatessen v Schumacher,
 
 52 NY2d 105, 109; Restatement [Second] of Contracts § 33 [1981]). The doctrine of definiteness serves two related purposes.
 

 First,
 
 unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy
 
 (see, Metro-Goldwyn-Mayer v Scheider,
 
 40 NY2d 1069, 1070-1071; Restatement [Second] of Contracts § 33 [2] [1981]). This is particularly significant where specific performance is sought.
 
 Second,
 
 the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement
 
 (see,
 
 Restatement [Second] of Contracts § 33 [3] [1981]).
 

 While the settled principles are easily articulated, their proper application has sometimes proved elusive. The difficulty is that the concept of definiteness cannot be reduced to a precise, universal measurement (Calamari & Perillo, Contracts § 2-9, at 53 [3d ed]). The standard is necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of
 
 *483
 
 the parties
 
 (id.,
 
 at 54; Farnsworth, Contracts §§ 3.27, 3.29 [1982]).
 

 Moreover, at some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract
 
 (see, Cohen & Sons v Lurie Woolen Co.,
 
 232 NY 112, 114 [Cardozo, J.]; Murray, Contracts § 27, at 47 [2d ed 1974]). While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be "pedantic or meticulous” in interpreting contract expressions (1 Corbin, Contracts §95, at 396 [1963];
 
 see also,
 
 UCC 2-204 [3]). Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear (1 Williston, Contracts § 47, at 153-156 [3d ed 1957]). The conclusion that a party’s promise should be ignored as meaningless "is at best a last resort.”
 
 (Cohen & Sons v Lurie Woolen Co.,
 
 232 NY, at 114,
 
 supra.)
 

 Passing from the general to the particular, a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage
 
 (Metro-Goldwyn-Mayer v Scheider,
 
 40 NY2d 1069, 1070-1071,
 
 supra;
 
 Annotation,
 
 Requisite Definiteness of Price to Be Paid in Event of Exercise of Option for Purchase of Property,
 
 2 ALR3d 701). A price "so arrived at would have been the end product of agreement between the parties themselves.”
 
 (Martin Delicatessen, supra,
 
 at 110.)
 

 That standard is met here. Applying the foregoing principles to the facts, we conclude that the price term was sufficiently definite for an enforceable contract.
 

 Addressing first the language of the agreement, the option manifests the parties’ unmistakable intent that price was to be fixed by a third person — the Department of Health — itself providing an objective standard without the need for further expressions by the parties
 
 (compare, Martin Delicatessen, su
 
 
 *484
 

 pra; see also,
 
 UCC 2-305 [1] [c]; 1 Corbin,
 
 op. cit.,
 
 § 98, at 435-436; Farnsworth,
 
 op. cit.,
 
 § 3.28, at 198; Knapp,
 
 Enforcing the Contract to Bargain,
 
 44 NYU L Rev 673, 696 [1969]). That the agreement additionally directed the Department to fix the price "in accordance with the Public Health Law and all applicable rules and regulations” does not render the term indefinite.
 

 Defendant urges that there is in fact no "applicable” rule or regulation for fixing the sales price of real property and therefore the essential term is illusory. But it is apparent from the agreement that these parties reposed discretion in the Department to make the price determination, limited only by the requirement that it apply provisions that were suitable, pertinent and appropriate for the task at hand. As the dissenting Justice below correctly observed, while the regulations did not authorize the Department to set a purchase price they did provide a means of fixing one — which is all these parties required. "The Public Health Law contemplates 'Medicaid’ reimbursement to nursing home operators for 'real property costs’
 
 (see,
 
 Public Health Law § 2808), including reasonable rent
 
 (see,
 
 10 NYCRR 86-2.21 [c]) and, where the operator is the owner, the reasonable costs of acquisition, e.g., amortization, interest and 'return of equity’
 
 (see,
 
 10 NYCRR 86-2.21 [e]).” (144 AD2d, at 525 [dissenting opn].)
 

 That the Department could indeed calculate a price by reference to its rules and regulations is evidenced by the fact that it did exactly that. As reflected in its letter fixing the price, the Department followed its regulations by referring to historical cost, then reducing that figure by the amount paid by the Medicaid program as capital cost reimbursement as of January 1980, and announcing the option price.
 

 Beyond the contract language, the undisputed circumstances in which this agreement was made further confirm that the Department was to have the authority it exercised in fixing the price.
 

 This was hardly an ordinary contract concluded between two private parties. Hollander’s overriding objective was to avoid incarceration for his crimes; only the binding agreement he had reached with plaintiff literally on the eve of sentencing permitted him to make the representations to the court necessary to attain that objective. The Department’s interest was to ensure the continuing operation of the nursing home, on a financial basis that would attract a responsible operator yet
 
 *485
 
 meet the cost-containment standards set by law for this largely publicly funded program.
 

 The agreements repeatedly refer to plaintiffs limited resources and inability to pay more than reimbursable amounts. The receivership agreement states that plaintiff is a not-for-profit corporation having minimum capital, that plaintiff may not receive any fee as a receiver, and that "[notwithstanding anything to the contrary contained herein or in the Lease, the liability of [plaintiff] for rent, additional rent or other liability due to the Landlord or the Operator hereunder shall be limited to amounts finally determined by the Department or other applicable authority to be reimbursable under the Medicaid program.” Likewise, the lease reflects the parties’ recognition that plaintiff expects that "the primary source of its revenues” from the operation of the nursing home would be Medicaid payments and that this expectation was "a substantial and material inducement” to enter into the lease.
 

 In these circumstances, when the parties designated the Department to fix the option price, that designation was obviously not for the purpose of calculating the nursing home’s market value (see, Farnsworth,
 
 op. cit.,
 
 § 3.28, at 198, n 20 [noting the risks of third-party valuation]). Defendant’s contention that, under this agreement, it is somehow entitled to the equivalent of fair market value is simply without substance.
 

 Bearing in mind the two objectives served by the definiteness requirement in contract law, there is no legal justification for voiding this agreement. The terms of agreement and the appropriate remedy can be readily determined, and it is plain that the parties intended this to be a complete and binding contract. Far from being a necessary "last resort,” to declare this defendant’s promise legally meaningless — thus allowing it to walk away with its property after enjoying the benefits of the bargain — defeats the reasonable expectations of the parties in entering into the contract and is a misuse of the definiteness doctrine.
 

 Given an enforceable agreement that permitted the Department of Health to fix the option price as it did, and given defendant’s refusal to comply, there can be no question that defendant has breached the contract. Where, as here, the agreement is for the conveyance of real property, specific performance rather than damages is the appropriate remedy
 
 (see, Van Wagner Adv. Corp. v S & M Enters.,
 
 67 NY2d 186, 192).
 

 
 *486
 
 Accordingly, the order of the Appellate Division should be reversed, with costs, and judgment granted in plaintiffs favor.
 

 Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
 

 Order reversed, etc.
 

 *
 

 Hollander’s request was made pursuant to Public Health Law § 2810 (1), which provides: "The owner or owners of any residential health care facility may at any time request the department to take over the operation of such facility by the appointment of a receiver. Upon receiving such a request, the department may, if it deems such action desirable, enter into an agreement with any such owners on the appointment of a receiver to take charge of the facility under whatever conditions as shall be found acceptable by both parties. Receivership commenced in accordance with the provisions of this subdivision shall terminate at such time as is agreed upon by the parties, or at such time as either party notifies the other in writing that he wishes to terminate such receivership.”