**CLEVELAND WRECKING COMPANY, Plaintiff,**

v.

**HERCULES CONSTRUCTION CORP., and Hercules Construction and Development, Inc., Defendants.**

No. 95–CV–1078 (JS).

United States District Court, E.D. New York.

Sept. 29, 1998.

Sayward Mazur, Mazur, Carp, and Rubin, P.C., New York City, for Plaintiff.

Arthur J. Semetis, Rivela, Pawa, and Blum, LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court is Defendants' joint motion for summary judgment in this alleged contract dispute. Plaintiff is asserting claims for lost anticipated profits pursuant to a purported oral subcontract agreement entered into with Defendants. Defendants contend that no oral contract ever existed between the parties or, in the alternative, that the contract is barred by the applicable statute of frauds.

## BACKGROUND

The Defendants, Hercules Construction Corporation and Hercules Construction and Development Corporation (collectively "Hercules") are engaged in the general contracting business. The plaintiff, Cleveland Wrecking Company ("Cleveland"), is a demolition subcontractor.

On October 21, 1994, Hercules was preliminarily declared the apparent low bidder on the partial demolition and reconstruction of a subway car repair barn for the New York City Transit Authority (the "Project"). In November, 1994, Hercules solicited Cleveland to bid on the demolition work for the Project. Thereafter, Hercules' Project Manager, Frank Ruggiero, and its consultant, George Asimakos, met with Shelly Lipsett, Cleveland's Vice–President in charge of the New York office, at the Project site to review specifications and drawings outlining the scope of work to be performed. A few days later, Cleveland sent Steven Schwartz, a cost estimator to the Project site to determine Cleveland's cost to perform the work.

On December 6, 1994, Cleveland sent its bid proposal to Hercules, detailing its proposed scope of work and price. On December 14, 1994, a meeting was held attended by Steve Schwartz and Shelly Lipsett, representing Cleveland, and Frank Ruggiero, George Asimakos and Gregory Rigas of Hercules wherein the scope of the work to be performed was modified, and a price of $980,-000.00 was agreed upon. This price was based upon the assumption and assurances made by Hercules that access to the site would be permitted via a temporary road and rubble ramp to be located at the north/northwest side of the Project site. This would ensure the least expensive means of ingress and egress. The Project site is surrounded on the north/northwest side by the Bronx Zoo, a New York State Department of Transportation facility and a New York City Department of Parks and Recreation facility. Therefore, it was necessary for Hercules to obtain approval from these agencies in order to obtain the proposed access to the site.

At the end of the meeting, the parties shook hands and Frank Ruggiero of Hercules agreed that a letter of intent would follow and a contract would be forthcoming once Hercules received the award of the project from the Transit Authority and the necessary access approval. On December 21, 1994, Hercules received formal notification from the Transit Authority that they had been accepted as general contractors for the project. However, Hercules was denied permission from the city to access the Project site from the proposed point of access on the north/northwest side. After numerous phone calls from Cleveland, Hercules informed Cleveland that they had hired another subcontractor to perform the demolition work.

## DISCUSSION

### I. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGEMENT

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)).

The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2725, at 93–95 (1983)). A party opposing a motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Under the law of the Second Circuit, "when no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations omitted).

 In the context of a contractual dispute, summary judgment may be granted where the contract conveys a "definite and precise meaning absent any ambiguity," *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992), and under New York law, whether contract language is ambiguous is a question of law properly resolved on a motion for summary judgment. *Id.See also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989) (finding summary judgment "perfectly appropriate" where intent can be ascertained).

It is within this framework that the Court addresses the present summary judgment motion.

## II. NEW YORK LAW APPLIES

 Jurisdiction in this action is based upon diversity of citizenship as Cleveland is a Delaware Corporation with its principal place of business in California and Hercules is a New York Corporation with its principal place of business in New York. A federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In contract cases, New York courts apply a "center of gravity" or "grouping of contacts" approach. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997). The relevant factors or contacts include the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *See In re Allstate Ins. Co.*, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936 (1993). The paramount factors are the place of contracting

and the place of performance. *Id.* Public policy considerations, however, may trump this determination "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *Id.* at 226, 597 N.Y.S.2d at 907, 613 N.E.2d 936. In the instant action, all the relevant factors require application of New York law, to which neither party disputes.

## III. THE EXISTENCE OF AN ORAL CONTRACT

As an initial consideration, Defendants contend that summary judgment is appropriate because, as a matter of law, no oral contract existed between the parties. Specifically, they assert that there was no meeting of the minds on the essential terms of price and the scope of the work to be performed.

To establish a claim for breach of contract under New York law, a plaintiff must prove: (1) that an agreement existed between it and defendant; (2) what the respective obligation of the parties were; (3) that the plaintiff performed its obligations under the agreement; (4) that the defendant breached the agreement by failing to perform its obligations; and (5) that the plaintiff suffered damages as a result of the breach. *Paper Corp. of the United States v. Schoeller Technical Papers, Inc.*, 807 F.Supp. 337, 341 (S.D.N.Y.1992). "Under New York law, no contract exists, nor may one be implied, where parties do not agree to its material terms." *Tower Int'l, Inc. v. Caledonian Airways, Ltd.*, No. CV–93–1122, 1996 WL 68531, at *4 (E.D.N.Y. Jan. 25, 1996) (citing *Cyberchron Corp. v. Calldata Systems Dev.*, 831 F.Supp. 94 (E.D.N.Y.1993), *aff'd in part, vacated in part*, 47 F.3d 39 (2d Cir.1995)). The essential elements of a construction contract include price, scope of work to be performed, and the time of performance. *See, e.g., A & M Wallboard, Inc. v. Marina Towers Assocs.*, 169 A.D.2d 751, 565 N.Y.S.2d 118, 119 (2d Dep't 1991). The parties herein negotiated a price of $980,000.00, the scope of work to be performed essentially consisted of demolishing the existing structure at the site, and the time of performance was to be 16 weeks from commencement of the work, upon the award of the prime contract.

For an agreement to be enforced, "it must be sufficiently 'definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty.' " *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 (2d Cir.1987) (applying New York law, quoting *Candid Productions, Inc. v. International Skating Union*, 530 F.Supp. 1330, 1333 (S.D.N.Y. 1982)). Thus, "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687, 575 N.E.2d 104 (1991) (internal quotations and citations omitted). A court considering whether or not a contract has been formed must apply an objective test:

> What is looked to in determining whether an agreement has been reached is not the parties' after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time.... In determining whether the parties entered into a contractual agreement and what were its terms, "disproportionate emphasis is not to be put on any single act, phrase, or other expression, but instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain...."

*Reprosystem, B.V. v. SCM Corp.*, 522 F.Supp. 1257, 1275 (S.D.N.Y.1981) (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399–400, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999 (1977)), *rev'd in part on other grounds*, 727 F.2d 257 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). It is not the parties' subjective intent that is determinative, thus, even where the parties "believe they are bound, if the terms of the agreement are so vague and indefinite that there is ... no means by which such terms may be made certain, then there is no enforceable contract." *Deligiannis v. PepsiCo, Inc.*, 757 F.Supp. 241, 256 (S.D.N.Y.1991) (internal citations omitted). Therefore, where a contract does not have such essential terms as the time or manner of performance or price to be paid, the contract is unenforceable. *Id.*

■ A plaintiff faces a heavier burden when trying to prove an alleged oral contract. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985). To ensure that parties are not trapped into "surprise contractual obligations that they never intended," *Arcadian Phosphates, Inc.*, 884 F.2d at 72 (internal quotations omitted), more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract. *N.F.L. Ins. Ltd. v. B & B Holdings, Inc.*, 874 F.Supp. 606, 613 (S.D.N.Y.1995). In the context of settlement agreements, the Second Circuit recently considered the negative policy implications of binding oral agreements, finding that "[e]nforcing premature oral settlements against the expressed intent of one of the parties will not further a policy of encouraging settlements. People may hesitate to enter into negotiations if they cannot control whether and when tentative proposals become binding." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir.1997).

The Court is of the opinion that the parties to the instant action did come to substantial agreement on the scope of the work to be performed. The established price, however, was based on the representation by Hercules' that access approval was forthcoming, and the subsequent receipt thereof, along with receipt of the formal award of the prime contract. Although Hercules did receive the contract, access approval was denied.

The Defendants contend that there was no meeting of the minds as to price and scope of work. According to Hercules, the agreement was contingent upon obtaining access via the north/northwest side of the project site. Therefore, Defendants maintain, once they were unable to obtain the proposed access, there was no longer any agreement between the parties. The $980,000.00 price would no longer be acceptable because ingress and egress from any other point would greatly increase Cleveland's cost, and Cleveland had initially indicated that the price was based upon such specific access.

■ Courts are loath to deny enforcement of agreements on indefiniteness grounds, *166 Mamaroneck*, 78 N.Y.2d at 91, 571, N.Y.S.2d 686, 575 N.E.2d 104, however, if "there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Best Brands*, 842 F.2d at 587 (internal quotations and citations omitted). *See also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 923, 548. N.E.2d 203 (1989) ("Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Brands v. Urban*, 182 A.D.2d 287, 289, 587 N.Y.S.2d 698, 700 (2d Dep't 1992) (summary judgment is appropriate where there was no meeting of the minds on the material element of price). A court should endeavor to hold the parties to their bargain "where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term," *Mamaroneck*, 78 N.Y.2d at 91, 571 N.Y.S.2d at 688, 575 N.E.2d 104, however, as discussed *infra*, this was not such an instance.

■ The Court notes that evidence of a handshake is of no particular significance if the weight of the evidence indicates that no contract was established. *See, e.g., Ciaramella*, 131 F.3d at 325 (finding statement "[w]e have a deal" was not an explicit waiver of an express signature requirement); *R.G. Group Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 73 (2d Cir.1984) (summary judgment appropriate notwithstanding party having entered into what it believed to be a "handshake deal"); *Mellencamp v. Riva Music Ltd. .*, 698 F.Supp. 1154, 1168 (S.D.N.Y.1988) ("wholly ephemeral assertions" that a handshake evinces a firm agreement in some circles are "inadequate as a matter of law"); *Davidson Pipe Co. v. Laventhol & Horwath*, No. 84–Civ. 5192, 1986 WL 2201, at *5 (S.D.N.Y. Feb.11, 1986) (oral statement "we have a deal" insufficient to bind parties who have reserved right to be bound only by an executed contract).

■ As the established price was predicated on approval of the access point, once

approval was denied, the established price was no longer binding. Because it is axiomatic that price is an essential ingredient of every contract for the rendering of services, the agreement must be definite as to compensation. *See, e.g., Time, Inc. v. Kastner,* 972 F.Supp. 236, 239 (S.D.N.Y.1997); *Tower Int'l,* 1996 WL 68531, at \*4; *Cooper Square Realty, Inc. v. A.R.S. Management, Ltd.,* 181 A.D.2d 551, 581 N.Y.S.2d 50 (1st Dep't 1992); *Phil Kriegel Assocs. Inc. v. M. Lahm Knitting Mill, Inc.,* 179 A.D.2d 539, 579 N.Y.S.2d 44, 45 (1st Dep't 1992) *See also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 108, 436 N.Y.S.2d 247, 248, 417 N.E.2d 541 (1981) (finding rental clause permitting renewal "at annual rentals to be agreed upon" to be indefinite and unenforceable).

However, it is not always necessary that the agreement include the price, because reference to an extrinsic standard is availing where appropriate. As the New York Court of Appeals explained in *Cobble Hill:*

> Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage.... A price so arrived at would have been the end product of agreement between the parties themselves.

*Id.,* 74 N.Y.2d at 483, 548 N.Y.S.2d at 923, 548 N.E.2d 203 (internal citations omitted). Industry custom and usage may be utilized by a court, however, "custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question." *Hutner v. Greene,* 734 F.2d 896, 900 (2d Cir.1984); *see also Cooper Square Realty, Inc.,* 181 A.D.2d at 551, 581 N.Y.S.2d at 51 ("Where no fee is stated, courts may not calculate a fee without custom and usage evidence to establish an extrinsic standard which is 'fixed and invariable' in the industry in question."). Although there was a reference to a price increase of approximately fifty percent if access was denied, this was vague and speculative and did not represent an agreed upon amount. Additionally, there was no evidence presented to suggest that Cleveland's manner of pricing this demolition job was in accordance with a readily discernible industry standard methodology.

Alternatively, price can be determined based upon a prior course of dealings between the parties. *See Eli Attia Architects v. Safra,* No. 94 Civ. 2928, 1996 WL 480721, at \*4 (S.D.N.Y. Aug.23, 1996). In this instance, however, the parties had never before transacted business nor entered into contract negotiations. Further, the parties did not agree to be bound by an amount determined in a judicial or arbitral forum. *See Joseph Martin,* 52 N.Y.2d at 111, 436 N.Y.S.2d at 250, 417 N.E.2d 541.

During negotiations, the parties apparently took for granted that access approval was imminent, and in so doing, they failed to establish contingency plans. By not establishing a price for the work performed in the event access was not via the north/northwest point, there was no meeting of the minds on the essential price element, and therefore, the agreement was indefinite and legally deficient.

## IV. A PRELIMINARY BINDING AGREEMENT

It may be possible, however, for the arrangement of December 14, 1994, to be construed as an agreement to agree, which may, in certain circumstances, have binding effect. Defendants contend that summary judgment is appropriate because, as a matter of law, no binding preliminary agreement existed between the parties. Generally, "a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin,* 52 N.Y.2d at 109, 436 N.Y.S.2d at 249, 417 N.E.2d 541. The Second Circuit recently explicated the atypical circumstances under which preliminary manifestations of assent requiring further negotiations create binding obligations. *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996). Noting that it is a rare instance in which a preliminary agreement clearly manifests such intention as to create a binding obligation, *id.,* nonetheless, as established by Judge Leval,

there are two categories of binding preliminary contracts. *See Teachers Ins. & Annuity Ass'n of America v. Tribune Co.,* 670 F.Supp. 491, 497–99 (S.D.N.Y.1987). Describing the two categories:

"Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities. Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework."

*Shann,* 84 F.3d at 77. *See also Arcadian Phosphates, Inc.,* 884 F.2d at 72; *Tribune,* 670 F.Supp. at 498.

 Here, it appears that the parties believed they were in agreement, predicated on a blind anticipation of access approval, and did not recognize the distinct possibility of the changed circumstances. It is possible that Hercules was cognizant of the risk that approval would not arise, and would address the issue at that juncture, without the burden of a binding agreement. Cleveland was clearly not prepared to commit to performance or to submit a firm contract price without knowing where access would be provided. There is no indication from the record suggesting that the parties agreed to bind themselves to negotiate an unanticipated occurrence affecting an essential term.

Mr. Lipsett testified that he was told that access via the north/northwest location and the rubble ramp was in the process of being secured and was forthcoming very shortly. (Lipsett Dep. 323.) There was no discussion what would happen or what alternative means would be utilized if that ramp was not available, nor were there guarantees discussed with respect to the ramp, and although Lipsett suggested that it was left to be negotiated, he testified that there was no agreement as to how the potential problem of the ramp would be solved. (Lipsett Dep. 325, 354.) Access, of course, had a substantial impact on the job because it was "the basis of how we should figure the job. That would be our access and egress from the job," and was critical to the performance of the contract. (Lipsett Dep. 141, 391.)

Steven Schwartz, Cleveland's cost estimator, testified that the point of egress was critical and extremely dollar sensitive because it implicated the handling of materials which is where the cost adds up. (Schwartz Dep. 97–98.) In fact, the bid price would increase by as much as 50 percent as there were six items that would be impacted if the ramp were built somewhere else, and Cleveland would not have performed the demolition work at the agreed upon price of $980,000.00 if access were not via the north/northwest point. (Schwartz Dep. 125, 149, 164.) To access the project from another location would likely necessitate double handling charges for the materials and the steel would have to be cut into smaller pieces. (Schwartz Dep. 150–51.) In addition, although Cleveland had agreed to install the ramp and temporary road for access via the north/northwest point, there was no discussion of who would install the ramp and at what cost, if the ramp was to be built at another location on the site. (Schwartz Dep. 153.)

The grave importance of the access point is borne out by the ultimate result; Cleveland estimated a cost of $13,000.00 to construct the ramp and roadway at the north/northwest point, whereas an elevated ramp was finally constructed at the southwest side of the Project site at a cost of $225,000.00. (Bregianos Aff. ¶ 25.)

Assuming, *arguendo,* the December 14 meeting did in fact result in an Type I agreement to agree, it still must meet the requisites necessary for formation of a binding contract. The Second Circuit has "articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides. The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the

agreement at issue is the type of contract that is usually committed to writing." *P.A. Bergner & Co. v. Martinez*, 823 F.Supp. 151, 156 (S.D.N.Y.1993) (citing *Winston*, 777 F.2d. at 80). When weighing these factors, courts are reminded that no single factor is decisive, and each provides significant guidance. *R.G. Group, Inc.*, 751 F.2d at 74.

With respect to the first factor, the agreement is difficult to analyze because it was never reduced to writing. Although neither party produced evidence of an express reservation, the recognition of the need for a letter of intent to be followed by a formal contract is indicative of a present non-binding status. *See, e.g., Arcadian*, 884 F.2d at 72 (reference in memorandum to a binding sales agreement to be completed at some future date demonstrated defendant's intent not to be bound until that time); *Reprosystem, B.V.*, 727 F.2d at 262 (reference in informal agreement to future formal agreement held to demonstrate intent of parties not to be bound). Yet, this is not dispositive of the issue because it is a case-specific inquiry and some courts have viewed a letter of intent as just a post-contractual formality. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir.1993) ("Simply because the parties contemplate memorializing their agreement in a formal document does not prevent their agreement from coming into effect before written documents are drawn up. That is, if the parties have settled on the contract's substantial terms, a binding contract will have been created, even though they also intended to memorialize it in a writing.") (internal citations omitted). The parties' failure to address what would occur if access was denied via the north/northwest point, strongly suggests that the agreement was inextricably linked to such approval, without which neither party was bound. Moreover, where there is no clear indicia, "the presumption rests with an intent not to be bound." *See Ogden Martin Sys. of Tulsa, Inc. v. Tri–Continental Leasing Corp.*, 734 F.Supp. 1057, 1069 (S.D.N.Y.1990). Accordingly, the first factor has an equivocal result, with slight support for Defendants.

The second factor looks to the existence, *vel non*, of partial performance undertaken by Cleveland. This factor does not favor Plaintiff. Rather, the record indicates that the actions taken in preparation of performance are wholly insufficient and were only comprised of Cleveland's beginning its mobilization process by making phone calls for scheduling purposes and examining the equipment needs. Specifically, Lipsett testified that "[o]ther than trying to contact Mr. Ruggiero and somewhat scheduling in our scheduling people and checking availability of our own equipment and whatnot, I don't think we did all that terribly much." (Lipsett Dep. 359.) Plaintiff asserts that in a demolition job, there is presumably nothing more that could be done until access to the site is obtained. Partial performance under both New York law and general contract principles is a significant factor in determining the existence of a binding oral agreement. *See Metro–Goldwyn–Mayer, Inc. v. Scheider*, 40 N.Y.2d 1069, 1070–71, 392 N.Y.S.2d 252, 253, 360 N.E.2d 930 (1976) ("where the parties have completed their negotiations of what they regard as essential elements, and performance has begun ... the court will find and enforce a contract"); *see also Viacom Int'l Inc. v. Tandem Productions, Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975) (partial performance "is strong circumstantial proof that the minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument"). However, "[p]artial performance requires some actual performance of the contract, and the test is therefore the same as for unjust enrichment: [Cleveland] must have conferred something of value upon [Hercules] which [Hercules] accepted." *P.A. Bergner & Co.*, 823 F.Supp. at 157; *cf Lehrer McGovern Bovis, Inc. v. New York Yankees*, 207 A.D.2d 256, 615 N.Y.S.2d 31 (1st Dep't 1994) (reversing grant of summary judgment where construction management firm performed substantial pre-construction services); *accord Clement S. Crystal Inc. v. Denberg*, 237 N.Y.S.2d 102 (N.Y.Sup.Ct.1962) (finding valid oral contract where plaintiff performed 3500 man hours prior to defendants' decision to forego construction of building). In the case at bar, Cleveland's preliminary preparation only assisted Cleveland and did not confer a benefit upon Her-

cules, and accordingly, it did not constitute partial performance.

■ Cleveland also cannot find support in the third factor—whether all of the terms of the alleged oral contract have been agreed upon. This is not an instance where the material terms have been decided and a few minor points remain to be negotiated. It should be noted that Cleveland had not reviewed the prime contract documents on or before December 14, 1994, and was not aware of the specific sections which applied to the work Plaintiff was to perform. (Lipsett Dep. 264.)

Although the price was initially agreed upon, once it had to be significantly changed the concordance dissolved. Changes requiring revision of the agreement typically result in a finding that there was no complete contract. *See R.G. Group, Inc.*, 751 F.2d at 75. *See also Adjustrite Sys. Inc. v. GAB Business Servs. Inc.*, 145 F.3d 543, 550 (2d Cir. 1998) (quoting *Tribune*, 670 F.Supp. at 499 ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents.")); *Ciaramella*, 131 F.3d at 325 (finding parties had not reached agreement on all terms of the settlement because substantive material terms were unsettled); *Winston*, 777 F.2d at 82–83 (existence of minor or technical points of disagreement precluded finding a final agreement had been reached).

Once the price became uncertain, the contract became devoid of a critical term. For example, in the context of a million dollar computer program purchase, the court in *Adjustrite* considered the software and affiliated personnel to be an integral and essential part, necessitating specific contractual inclusion, *id.* at 551, and stated, "[i]n determining whether omitted terms are essential to a contract, New York courts adopt a flexible approach and look at the 'broad framework' of a contract." *Id.* at 550 (citing *Shann*, 84 F.3d at 79). Here, the possibility of a 50 percent increase renders the price an essential element requiring firm agreement, which cannot be considered just another term requiring future clarification. Accordingly, the third factor strongly favors Hercules.

■ The fourth factor, whether it is customary to put such agreements in writing, slightly favors Plaintiff. The record indicates that Plaintiff has entered into oral subcontracts in other instances which were subsequently followed by written contracts. Lipsett testified that "written contracts [are] viewed as a formality which had to be followed in order to get paid." (Lipsett Dep. 414.) In terms of Cleveland's own protocol, Lipsett testified that Cleveland performed work valued at approximately $500,000 as part of a $12.4 million job for another general contractor, and that a written contract was not executed until after performance had begun. (Lipsett Dep. 91.)

The construction industry often utilizes preliminary agreements between general contractors and subcontractors, pending award of formal prime contracts. Notwithstanding this convention, such agreements are typically not subject to future negotiation on price, unless price can be readily established through industry standard or a prior course of dealing, or was expressly subject to future negotiation. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citing New York cases in which price can be established at a later date based on industry standards or partial performance).

Courts also look to the complexity of the underlying agreement. Here, the contract involved a $980,000.00 demolition job requiring upwards of sixteen weeks to complete. Specifically, the job required the partial demolition of an extremely large steel barn, with the retention of one brick wall. The demolition was part of a $40 million reconstruction project. Further evidence of the job's complexity is the 27 page contract entered into between Hercules and the subcontractor who ultimately performed the demolition project. (Semetis Aff.2d Ex. D.) The contract price of $1,580,000.00 is also telling in that it reflects the added cost associated with access via the final approved location. All the parties admit that ultimately a formal written contract would be executed, and such a requirement "simply cannot be a surprise to anyone." *R.G. Group, Inc.*, 751 F.2d at 77.

The totality of the evidence leads to the patent conclusion that the December meeting and the agreement resulting therefrom was neither a definite agreement to agree nor a binding contract. *See, e.g., Adjustrite,* 145 F.3d at 551 (concluding that three of four factors indicate parties did not intend to be bound until formal documents were executed and therefore summary judgment was appropriate); *Ciaramella,* 131 F.3d at 326 (vacating district court's determination that a binding agreement was reached); *Arcadian,* 884 F.2d at 72–73 (affirming grant of summary judgment notwithstanding considerable partial performance where language of memorandum showed that parties did not intend to be bound until final contract was signed); *Winston,* 777 F.2d at 83 (reversing district court because parties were not bound to preliminary settlement agreement where three of four factors established parties did not intend to be bound until formal documents were executed and delivered, which did not occur); *N.F.L. Ins. Ltd.,* 874 F.Supp. at 613 (finding meeting resulted in "an indefinite agreement to agree rather than a binding contract.").

■ Assuming *arquendo* the December 14 meeting resulted in an Type II agreement to agree, that is, a preliminary manifestation of assent resulting in a binding preliminary agreement, courts consider the following factors in the analysis: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form as indicated by the customary form of such transactions. *Adjustrite Sys. Inc. v. GAB Business Servs.,* 145 F.3d 543, 549 n. 6 (2d Cir.1998) (citing *Arcadian,* 884 F.2d at 72).

The instant action is distinguished from the line of cases involving preliminary agreements to agree which purposely leave open terms to be negotiated in good faith. *See, e.g., P.A. Bergner & Co.,* 823 F.Supp. at 158; *Teachers Ins.,* 670 F.Supp. at 499; *Teachers Ins. & Annuity Ass'n of America v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986). Here the parties agreed on the price, however, the basic factors leading to that price failed to materialize. There was no indication that the price was subject to further negotiation or change.

■ The analysis, *supra,* of a Type I agreement is equally applicable here. As the language of the agreement was not memorialized, it is not suitable for detailed analysis. The context of the negotiations suggests its preliminary nature. It was the first formal negotiating session, nevertheless, the parties operated and negotiated under circumscribed circumstances, and the resultant agreement was predicated on the subsequent approval of the north/northwest access point. Access was a critical consideration, determinative of the contract price. The December 14, 1994 meeting did not address contingencies or alternative access possibilities. Just as receipt of the prime contract was a condition precedent to contract formation, equally so was receipt of approval of the predetermined access point. The price was not an open term, subject to future negotiation, but a fixed established amount. As discussed *supra,* there was no industry standard or prior practice to guide a court in determining the proper price. Moreover, the inexact suggestion that the cost could be as much as 50 percent more, neither bound the parties, nor paved the way for future negotiations, rather, it accentuated the parties reliance on access approval to establish the binding agreement. As discussed throughout, Cleveland's minimal action in furtherance of the potential contract does not warrant consideration as partial performance. Additionally, the parties realized that a letter of intent followed by a final formal contract was ultimately required, although it was not uncommon for general contractors and subcontractors to engage in preliminary oral agreements.

In sum, the five criteria utilized to determine whether the parties intended on forming a "Type II" preliminary commitment to negotiate together in good faith in an effort to reach a final agreement, leads the Court to conclude that the parties did not so intend.

## V. A CONDITION PRECEDENT TO CONTRACT FORMATION

■ The approval of the access point can also be considered a condition precedent to performance, or formation, of the contract. The plaintiff contends that attaining the proposed access to the site was not a condition

precedent to the formation of a contract. Lipsett stated that there was no mention of the deal being contingent on getting approval for the access ramp. (Lipsett Dep. 418.) In addition, an officer from Hercules acknowledges that there were no other contingencies or conditions discussed at the December 14th meeting other than Hercules being awarded the prime contract from the Transit Authority. (Ruggiero Dep. 81–82.) Throughout negotiations, Hercules told Cleveland that access to the site was not certain. (Ruggiero Aff. 6.) However, Hercules also stated that they were in the process of receiving approval and had a "firm belief" that they would receive permission for the proposed access "any day." (Lipsett Dep. 350). According to Cleveland, the denial of the proposed access is merely a changed condition and the price impact could be negotiated accordingly. (Lipsett Dep. 324.)

The New York Court of Appeals recently explained the significance of a condition precedent in *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995), stating:

> A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises' (Calamari and Perillo, Contracts § 11–2, at 438 [3d ed.] ). Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself. In the latter situation, no contract arises 'unless and until the condition occurs' (Calamari and Perillo, Contracts § 11–5, at 440 [3d ed] ).

*Id.* at 690, 636 N.Y.S.2d at 737, 660 N.E.2d 415 (internal citations omitted). If the condition does not occur, then the agreement, if any, is terminated. Thus, even if the December 14 meeting was considered a binding agreement to agree, approval for the access point was a condition precedent to formation of the contract. *See N.F.L. Ins. Ltd.*, 874 F.Supp. at 612 (finding participation by all members was a condition precedent to performance of the contract).

The Court of Appeals in *Oppenheimer & Co.* also informed that substantial performance is not applicable to excuse the non-occurrence of a condition precedent, rather, only forfeiture can be raised. 86 N.Y.2d at 692, 636 N.Y.S.2d at 738, 660 N.E.2d 415. Forfeiture is defined as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange." *Id.* n. 2 (quoting Restatement (Second) Contracts § 229, comment b). The Restatement summarizes the forfeiture doctrine thusly, "[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Restatement [Second] of Contracts § 229. As described *supra*, Cleveland did not take actions sufficient to qualify as partial performance pursuant to the terms of the purported agreement, and clearly forfeiture did not occur. Accordingly, the Court finds that Hercules' receipt of approval to access the Project site at the north/northwest point, as understood by the parties, constituted a condition precedent to formation of the contract, and having failed to satisfy the condition, no valid contract was formed.

Although Defendants' conduct in awarding the contract to another demolition company, without notifying and affording Cleveland an opportunity to bid, was not a paradigm of proper business etiquette, Hercules was not contractually obligated to Cleveland.

## IV. STATUTE OF FRAUDS

Having found that no binding contract was established, the applicability of a statute of frauds defense is inconsequential, however, the Court will quickly touch upon the arguments raised. Defendants assert that three elements of the agreement could not satisfy the applicable statute of frauds and therefore an oral agreement could not be binding. The Statute of Frauds provides, in relevant part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed

by the party to be charged therewith, or by his lawful agent, if such agreement . . . [b]y its terms, is not to be performed within one year from the making thereof. N.Y.Gen.Oblig.Law § 5–701(a)(1) (McKinney 1993). It is undisputed that the alleged agreement entered into by Cleveland and Hercules was an oral agreement, accordingly, the question before the Court is whether this agreement was capable of being performed within one year, or whether it falls within an exception to the Statute of Frauds. As an initial consideration, the law is clear that for a contract to fall within the Statute of Frauds, performance of the contract within one year must be virtually impossible. *See Ohanian v. Avis Rent A Car Sys., Inc.,* 779 F.2d 101, 106 (2d Cir.1985) ("The one-year provision has been held not to preclude an oral contract unless there is not . . . the slightest possibility that it can be fully performed within one year.") (internal quotations omitted).

Defendants assert that the one year guarantee contained within the prime contract was to follow Cleveland's completion of performance. If the one year guarantee was part of one indivisible oral contract, then it would be incapable of performance within one year of the contract date, thereby making the agreement void under the Statue of Frauds. *See, Halpern v. Shafran,* 131 A.D.2d 434, 516 N.Y.S.2d 83 (2nd Dep't 1987) (holding agreement inclusive of one year warranty provision not capable of being performed within one year of the contract date).

■ In the present case, there is no evidence that the parties discussed any guarantees as part of their agreement. Although such guarantees against defects in material and workmanship are often contained within the boilerplate of prime contracts (Bregianos Aff. ¶ 15.), these guarantees were not discussed at the December 14, 1994 meeting, and in addition, they are not normally applicable to demolition work. The guarantees were not "part of one indivisible oral contract," *Halpern,* 131 A.D.2d at 436, 516 N.Y.S.2d at 84, and accordingly, they did not bring the contract within the statute of frauds. Collateral matters contained in a written document that are at best incorporated by reference in an oral agreement, cannot be the basis for a statute of frauds defense.

■ Even if the guarantees were part of the December 14, 1994 agreement, they could be viewed as a statement of present condition of Cleveland's work, as of the date of completion, rather than a promise by Cleveland to perform in the future as in *Halpern.* In *P.J. Carlin Constr. Co. v. Whiffen Elec. Co., Inc.,* 66 A.D.2d 684, 411 N.Y.S.2d 27 (1st Dep't 1978), the Appellate Division enforced an oral contract containing a two-year guarantee on labor, materials, and equipment. The court found that such a guarantee is, in reality, "a statement of present condition and not a promise of further performance." *Id.* at 685, 411 N.Y.S.2d 27.

■ Further, Hercules contends that a three year "books and records" requirement and a multiple year indemnification requirement under Hercules's prime contract were part of the agreement with Cleveland. However, there is no indication that these provisions were discussed between the parties at the December 14, 1994 meeting. The record similarly does not reflect that Cleveland ever had actual notice of these provisions since they did not see the prime contract between the Transit Authority and Hercules. (Lipsett Dep. 250.) Rather, Cleveland was only presented with the selected specifications that pertained to the work they were expected to perform. (Lipsett Dep. 146.) Moreover, Ruggiero, an officer of Hercules, testified that he gave Cleveland all of the information necessary to submit a proposal. This did not include information pertaining to the books and records requirement or the indemnification provision. (Ruggiero Dep. 69.)

■ The principle behind the Statute of Frauds is to ensure the existence of a valid agreement, rather than to supply every item that the parties could have conceivably included. *See Lande v. Radiology Specialists of Kingston P.C.,* 806 F.Supp. 1084, 1091–92 n. 11 (S.D.N.Y.1992). Moreover, "[t]he Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a con-

tract fairly, and admittedly made." 4 Williston, *Contracts* § 567A, at 19–20 (3d ed.).

Based on the evidence presented to the court, the alleged agreement between the parties was capable of being performed within one year. Therefore, a Statute of Frauds defense is not available as a matter of law.

## CONCLUSION

For all the aforementioned reasons, the Court finds that no reasonable factfinder could conclude, based on all the evidence in this case, that the parties agreed on all material elements and intended to be fully bound to perform under the "December 14, 1994 agreement" absent approved access via the north/northwest point of the Project site. Accordingly, Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close the case.