Hancock, Jr., J.
(dissenting). The majority’s invalidation of article tenth (B) (d) of the agreement is without precedent in New York and, in my view, constitutes an entirely unwarranted interference with the right of members of a partnership to establish reasonable contractual terms covering the withdrawal of a partner. The valuation provision is not contrary to public policy. Nor does it contravene the letter, the underlying intent or the purpose of Disciplinary Rule 2-108 (A). There is, in my opinion, no legal justification and no basis in fairness or logic for permitting plaintiff — who has accepted and operated under the agreement for 20 years — now to disaffirm it. I, therefore, respectfully dissent.
I
It is a general rule of this State’s public policy that "competent contracting parties [are held] to bargains made by them with their eyes open” (Simons v Fried, 302 NY 323, 324 [Loughran, Ch. J.]; see, Lewis v Vladeck, Elias, Vladeck, Zimny & Engelhard, 57 NY2d 975; see generally, Cobble Hill Nursing Home v Henry & Warren Corp., 74 NY2d 475). Specifically, with respect to partnership agreements, absent "prohibitory provisions of the statutes or of rules of the common law relating to partnerships, or considerations of public policy, the partners * * * may include in the partnership articles any agreement they wish concerning the sharing of profits and losses, priorities of distribution on winding up of the partnership affairs and other matters. If complete, as between the *103 partners, the agreement so made controls” (Lanier v Bowdoin, 282 NY 32, 38, rearg denied 282 NY 611). Thus, this court has noted that partners may include in the partnership articles practically "any agreement they wish” (see, Riviera Congress Assocs. v Yassky, 18 NY2d 540, 548).
Here, the partners of defendant law firm have agreed among themselves upon the amount to be distributed in the event of the withdrawal of a partner. Instead of dissolving the partnership and conducting an accounting (see, Partnership Law §§ 60, 69, 71), the parties have stipulated that the value of a withdrawing partner’s share in the partnership shall be determined by a formula. Basically, the agreement provides that the amount due equals the partner’s "withdrawable credit balance upon the Partnership’s books at the time of his withdrawal, together with the amount of his capital account”. In addition, a partner who doesn’t "continue to practice law in any state or other jurisdiction in which the Partnership maintains an office” is entitled to receive a percentage of the firm’s distributed profits for three years.[1] A withdrawing partner is entirely free to engage in the practice of law anywhere including areas where the law firm has offices and to serve any clients including clients of the firm irrespective of whether the departing partner was responsible for adding the client to the firm’s business. Simply stated, the partners have agreed that a withdrawing partner may practice in direct competition with the remaining partners. If the withdrawing partner elects to do so, however, the agreement provides that the partner must forego participation in the future distribution of profits of his or her former partners.
It is plaintiffs entitlement to share in the partnership’s distribution of profits after his withdrawal that is in dispute. Although he is practicing law as a partner in a major New York City law firm in direct competition with his former partners, he, nevertheless, claims the right (and under the majority decision is given the right) to share in their profits.
Plaintiff, the head of defendant law firm’s tax department and a party to the agreement for over 20 years, does not and *104 surely cannot in good conscience claim that the agreement is unfair. Indeed, during plaintiff’s time with the firm other partners have withdrawn. As a remaining partner, he accepted the benefits of the very withdrawal provision he now attacks.
In any event, there appears to be no basis for a claim that the clause is unreasonable. It cannot be questioned that the remaining partners may sustain a substantial financial loss from the withdrawal of a partner — particularly a partner of senior status, like plaintiff, whose prestige, expertise and following are of great value to the firm. The agreement merely gives effect to the wholly unexceptional proposition that a withdrawing partner who practices law in full competition with his former firm should not expect to share in the firm’s future distributions. Nor can plaintiff contend that he did not enter the agreement willingly or that he was unaware of its terms. On the contrary, he apparently participated in drafting it.
Finally, the agreement is not contrary to the generally applicable rules which sanction the "employee choice” doctrine where withdrawing partners must elect between future financial benefits and engaging in competition with former associates (see, Kristt v Whelan, 4 AD2d 195, affd without opn 5 NY2d 807 [citing Simons v Fried, 302 NY 323]; Sarnoff v American Home Prods. Corp., 798 F2d 1075, 1083-1084 [7th Cir 1986], upon remand 666 F Supp 137 [ND Ill 1987]; Murphy v Gutfreund, 583 F Supp 957, 963-965 [SD NY 1984]; Diakoff v American Re-Insurance Co., 492 F Supp 1115, 1121-1123 [SD NY 1980]; Kerpen v First Investors Corp., 45 Misc 2d 793, affd 26 AD2d 620; cf., Post v Merrill Lynch, Pierce, Fenner & Smith, 48 NY2d 84, 86-89, rearg denied 48 NY2d 975 [distinguishing involuntary termination cases from "employee choice” doctrine enunciated in Kristt]).
The sole basis for plaintiff’s position and the majority’s holding that plaintiff may abrogate his agreement is an interpretation of DR 2-108 (A), a disciplinary rule enacted by the Appellate Division, First Department. For reasons which follow I do not believe this rule can justify the majority’s decision.
II
The majority’s conclusion that the agreement violates DR 2-108 (A) is based on an interpretation of the disciplinary rule which is in conflict with its evident meaning and inconsistent *105 with its underlying purpose. Moreover, even if it be assumed that the withdrawal clause somehow conflicts with DR 2-108 (A), the conflict is not one that calls for invalidation of the agreement as contrary to any New York public policy.
A
DR 2-108 (A) is not a statute. Nor is it a rule which our court has approved. It is a disciplinary rule (see, Rules of App Div, 1st Dept. 22 NYCRR 603.2, see also, 691.2 [Rules of App Div, 2d Dept], 806.2 [Rules of App Div, 3d Dept], 1022.17 [Rules of App Div, 4th Dept]) adopted in identical form by the four departments of the Appellate Division, the courts charged under Judiciary Law § 90 (2) with the responsibility of disciplining attorneys (see, NY Const, art VI, § 4 [k]). The Appellate Division, First Department’s statement, concerning the purpose of its rule and why it does not apply to this clause is as follows:
"[W]e find that article tenth (B) (d) is not a restrictive covenant. It does not prevent plaintiff from practicing law in New York or in any other jurisdiction in competition with defendant. * * * [It] defines the economic rights and obligations of voluntarily withdrawing partners. The formula attempts to compensate the departing partner for profits earned but not received while a partner, and avoids the necessity for a complete accounting with each entering and exiting partner. Article tenth (B) (d) prevents departing partners who are likely to cause potential economic injury to the firm from either reaping the above-mentioned windfalls or from eating into what could be shrinking profits due to loss of business.” (144 AD2d, at 279-280.)
And further:
"[T]he principle underlying DR 2-108 (A) is the protection of the right of members of the public to select and repose confidence in lawyers of their choice without restriction by providing full availability of legal counsel. (See, Matter of Silverberg [Schwartz], 75 AD2d 817 [2d Dept 1980], appeal dismissed 53 NY2d 704; Dwyer v Jung, 133 NJ Super 343, 336 A2d 498 [1975], affd 137 NJ Super 135, 348 A2d 208 [1975]; Model Code of Profes *106 sional Responsibility EC 2-1, 2-26, 2-31.) The intent of DR 2-108 (A) is that clients have the widest possible choice of attorneys. (See, Dwyer v Jung, supra, at 346-347, 500, citing NY County Lawyers’ Assn Comm on Professional Ethics response to Question No. 6221 [73-9].) Consequently, provisions of partnership agreement which prohibit a partner’s representation of the firm’s clients upon withdrawal or totally prohibit the practice of law within a geographical area have been invalidated as contrary to public policy. (See, Matter of Silverberg [Schwartz], supra; cf., Dwyer v Jung, supra; see also, ABA Comm on Ethics and Professional Responsibility Inf Opn 1417.)” (144 AD2d, at 280-281 [emphasis added].)
I cannot agree with the majority’s rejection of the purpose of DR 2-108 (A) as stated by the Appellate Division — i.e., to forbid only those agreements which "totally prohibit the practice of law”. I find it remarkable that the majority accepts, instead, the all-inclusive interpretation of an Oregon intermediate appeals court which would invalidate any sort of financial preference given to withdrawing partners who do not compete with their former associates.[2]
Moreover, the majority’s categorically broad construction of DR 2-108 (A) is contrary to the history of the rule’s enactment *107 which shows that DR 2-108 (A) was aimed at covenants preventing a lawyer from practicing in a given geographical area or front representing particular clients — i.e., restrictive covenants. The genesis of DR 2-108 (A) is ABA Formal Opinions on Professional Ethics, No. 300 (1961), which was ultimately used as the basis for ABA Model Rule 5.6.[3] ABA Formal Opinion No. 300 holds that a restrictive covenant "prohibiting the employee from practicing law in the city and county in which [the employing lawyer] practices for a period of two years after termination of the employment” is unethical. The concept underlying Formal Opinion No. 300 is that lawyers have no proprietary interests in their clients — i.e., " '[c]lients are not merchandise’ ” (id.). It is the client’s right to retain and to discharge the lawyer. Thus, any agreement in which a practicing lawyer is prohibited from representing certain clients or from practicing law in a given area is proscribed as an " 'attempt to barter in clients * * * inconsistent with the best concepts of [the lawyer’s] professional status’ ” (id.). Such agreements are contrary to what has been termed "the better rationale” for rule 5.6 and DR 2-108 (A)— i.e., that they "impinge upon the right of future clients to free choice of counsel” (1 Hazard and Hodes, Lawyering, at 486; Wolfram, Modern Legal Ethics § 16.2.3, at 885, & n 45 [Prac ed 1986]).
Both the Appellate Division, First Department, in this case and the Appellate Division, Second Department, in Matter of Silverberg (Schwartz) (75 AD2d 817) construe DR 2-108 (A) consistently with the cardinal purpose underlying rule 5.6 and DR 2-108 (A): preventing agreements which interfere with the freedom of clients to retain and discharge attorneys. In Matter of Silverberg (Schwartz) (supra), the parties stipulated " that, upon the termination of this firm, each party shall continue to represent all his own clients and such new clients as each of them was responsible in obtaining for the new firm [and that] [u]nless a client directs otherwise in writing, neither party will represent the clients of the other for a period of at least *108 eighteen (18) months after termination of the firm’ ” (75 AD2d, at 818). In deciding that the agreement contravened DR 2-108 (A), the Appellate Division quoted the basic principle in Formal Opinion No. 300, that "[l]awyers should not traffic in clients”; the court held that "[Respondent cannot restrict petitioner’s practice by precluding him from representing former clients of the partnership that were originally obtained by respondent” (id., at 819).
In sum, the concern at the root of DR 2-108 (A) (as well as Formal Opn No. 300 and rule 5.6) is for the client (i.e., the public) — not concern for the lawyer’s financial well-being. Restrictions which somehow interfere with or restrict the freedom of present or future clients to hire and fire lawyers are what the rule aims to prohibit. Nothing in the wording of DR 2-108 (A) or its history suggests that the rule should be read to condemn agreements providing that lawyers who compete with their former firm will not share in its future distributions.
B
Even assuming for the sake of argument that the Lord, Day & Lord agreement in some way conflicts with DR 2-108 (A), what effect should this violation have in a civil action? The majority gives DR 2-108 (A) the force of a statute and apparently adopts the rule that any violation of DR 2-108 (A), without more, requires invalidation of the agreement. Again, I must disagree.
We have emphasized that the code is "not to be elevated to the status of decisional or statutory law” (Matter of Weinstock, 40 NY2d 1, 6). Indeed, the code, itself, makes clear that it does not "undertake to define standards for civil liability of lawyers for professional conduct” (Code of Professional Responsibility, Preliminary Statement, McKinney’s Cons Laws of NY, Book 29, at 356 [emphasis added]). Rather, the code[4] "is designed to be adopted by appropriate agencies both as an inspirational guide to the members of the profession and as a basis for disciplinary action when the conduct of a lawyer falls below *109 the required minimum standards stated in the Disciplinary Rules” (id., at 355). It has been said that the purpose of lawyer discipline " 'is not by way of punishment; but the court on such cases, exercises [its] discretion, whether a man whom [it has] formerly admitted, is a proper person to be continued on the roll or not’ ” (Wolfram, Modern Legal Ethics § 3.1, at 80-81 [Prac ed 1986] [quoting Ex Parte Brounsall, 2 Cowp 829, 98 Eng Rep 1385 [1778] [Lord Mansfield]). The code does not "attempt to prescribe either disciplinary procedures or penalties for violation of a Disciplinary Rule” (Code of Professional Responsibility, Preliminary Statement, op. cit., at 356). It specifies that the "severity of judgment against one found guilty of violating a disciplinary rule should be determined by the character of the offense and the attendant circumstances” (id., at 356).
In this case, the conduct of defendant law firm (and also of plaintiff, a former partner), in agreeing on article tenth (B) (d) of the partnership agreement — if it is deemed to contravene DR 2-108 (A) — is not the sort of conduct that would ordinarily give rise to disciplinary proceedings. There is no suggestion that the conduct was in any way deceitful, immoral or inconsistent with high professional standards. In this respect, the litigation here differs from other cases where the rights of attorneys in civil matters have turned on violations of the disciplinary rules (see, e.g., Hofreiter v Leigh, 124 Ill App 3d 1052, 465 NE2d 110, 111-113; Fleming v Campbell, 537 SW2d 118 [Tex Civ App 1976] [fee-splitting agreements are void as contrary to public policy]; see generally, Wolfram, Modern Legal Ethics § 2.6.1, at 52-53).
The conduct of defendant law firm does not warrant a sanction that is punitive in nature. Any justification for the imposition of a sanction on defendant must be found rather in some aspect of the conduct which is injurious to the public— i.e., some conduct that offends a public policy of such importance that it merits invalidation of the agreement. The public interest that is said to be served by DR 2-108 (A) is prohibiting "covenants [which] impinge upon the right of future clients to free choice of counsel” (1 Hazard and Hodes, op. cit., at 486). Can it be said that a clause like the one in question so seriously "impinges” on a client’s freedom of choice that it must be annulled on the grounds of public policy?
It is certainly questionable how much, if any, "impingement” can result from a financial disincentive provision like *110 the one here, particularly as applied to partners of major metropolitan law firms. The clause has assuredly not operated to "impinge” upon the rights of any clients — past or future— to retain plaintiff. As the Appellate Division noted, "upon withdrawing from the defendant law firm, plaintiff promptly joined a competing firm, where he began to service several of the same clients with whom he worked during his tenure at Lord, Day & Lord, without defendant seeking any injunctive or monetary relief against him.” (144 AD2d, at 279.)
In this case, the partners, including plaintiff, agreed upon a clause covering the value of a partner’s share upon withdrawal which provides — as fair recompense for the potential loss, of goodwill and clientele resulting when a withdrawing partner goes to a competing firm — that the remaining partners should not have to pay him or her a share of their profits. The agreement seems altogether reasonable and fair and, indeed, no one contends otherwise. If the agreement pertained to any other business or profession, there would be no question that the parties would be held to their bargain (see, Riviera Congress Assocs. v Yassky, 18 NY2d 540, 548, supra).[5] The "employee choice” doctrine would apply (see, supra, at 104).
The majority holds, however, that despite the reasonableness of the clause, it runs afoul of DR 2-108 (A) and, therefore, must be struck. In so doing, it rejects the interpretation that the Appellate Division of the First and Second Departments have given the rule and adopts instead the opinion of an intermediate Oregon appeals court (Gray v Martin, 63 Ore App 173, 663 P2d 1285). I believe that this interpretation is misguided and that, in any event, the claimed violation is not one that justifies striking the clause and, thus, imposing a sanction solely on defendant while plaintiff, who also violated the rule, is permitted to reap a substantial reward.[6]

. The percentage of participation in future distributions equals one third of the withdrawing partner’s average percentage of the firm’s profits for the three fiscal years preceding the date of withdrawal multiplied by the net profits of the firm "for services rendered before or after his withdrawal” for each of the ensuing three years commencing the first day of the month of withdrawal (partnership agreement, article tenth [B] [d] [emphasis added]).

. The majority’s attempt to find support for its construction in the language of DR 2-108 (A) and particularly in the meaning of the word "restrict” as it is intended in the exception to DR 2-108 (A) for retired lawyers is not persuasive. Professor Hazard concedes that the "purpose and meaning” of the clause "is not crystal clear,” and states that under it a retired lawyer may be required to agree to "stay retired” (1 Hazard and Hodes, Lawyering, at 486). Thus, the exception for retired lawyers permitting a total prohibition on the practice of law is an exception to the very sort of restriction that, according to the Appellate Division’s construction, is covered by the body of the rule.
Similarly, the language of DR 2-108 (B) outlawing an agreement made in connection with the settlement of a lawsuit "that restricts [the lawyer’s] right to practice law” (emphasis added) supports the Appellate Division’s interpretation of the word "restrict” as involving a total prohibition on practice. As explained by Professor Hazard, the rule outlaws an agreement under which a lawyer, as part of his settlement in a case, agrees not to represent other claimants in future cases (1 Hazard and Hodes, op. cit., at 487). The type of restriction that violates DR 2-108 (B) is one that completely prohibits the lawyer from representing clients and thus offends "the right of members of the public to select and repose confidence in lawyers of their choice without restriction by providing full availability of legal counsel” (Cohen v Lord, Day & Lord, 144 AD2d 277, 280 [citing cases]).

. DR 2-108 is substantially the same as ABA Model Rules of Professional Conduct, rule 5.6 which provides:
"A lawyer shall not participate in offering or making:
"(a) A partnership or employment agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
"(b) An agreement in which a restriction on the lawyer’s right to practice is part of the settlement of a controversy between private parties.”

. The Code of Professional Responsibility, as promulgated by the American Bar Association in August 1969, was adopted, with certain amendments, by the New York State Bar Association as its own code of ethics, effective January 1, 1970. The Appellate Divisions’ rules provide that attorneys who fail to conduct themselves in conformity with the State code are guilty of professional misconduct.

. The majority cites Gelder Med. Group v Webber (41 NY2d 680, 684) to support the conclusion that public policy would be violated if this agreement were not invalidated (majority opn, at 101). Gelder provides no such support. As the Gelder court stated "[covenants restricting a professional * * * from competing with a former employer or associate are common and generally acceptable [citations omitted]” (id., at 683).

. Had plaintiff voiced his concern earlier for the public policy implications of article tenth (B) and the possible violation of DR 2-108 (A), a ruling could have been sought from the State Bar Association Committee on Ethics. If the firm had been aware of the potential violation, it could simply have eliminated any provision for the payment of future profits to departing partners. Any violation of DR 2-108 (A) would thus have been obviated, *111 although departing partners going to academia or following other pursuits which could not damage the firm would be deprived of benefits. Plaintiff does not satisfactorily explain why he saved his protest against the rule until after he had withdrawn and voiced it for the first time in his claim to the proceeds.